

Gregory McGillivary
gkm@mselaborlaw.com

May 8, 2020

**VIA ECF**
Hon. Lorna G. Schofield
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re:    *Worley et al. v. City of New York and NYPD,* Case No.: 17-cv-4337 (LGS)

Dear Judge Schofield:

Plaintiffs respectfully submit this letter on behalf of all parties regarding the proposed Settlement Agreement ("Agreement" or "Settlement") between the Plaintiffs and the Defendants, the City of New York and the New York City Police Department (Defendants) in the above-referenced case brought under the Fair Labor Standards Act (FLSA). For the reasons set forth below, the Settlement is fair and reasonable, and should be approved. The signed Settlement Agreement (Exhibit 1), and a Proposed Order (Exhibit 2) are attached, along with supporting declarations from Plaintiffs' Counsel, Gregory K. McGillivary (Exhibit 3), Molly A. Elkin (Exhibit 4), Hope Pordy (Exhibit 5), and Diana J. Nobile (Exhibit 6). Pursuant to Paragraph 8.1 of the Agreement, the Parties request a Settlement approval conference within the next 30 days at a time convenient to the Court by telephone or otherwise.[1]

The Plaintiffs — 3,880 individuals employed or formerly employed by the Defendants as School Safety Agents (SSAs) in the NYPD's School Safety Division (SSD)[2]— have been informed of the terms of the Settlement and have been provided with an opportunity to review the Settlement Agreement. There have been no objections to the Settlement. The parties now submit the Settlement Agreement for the Court's consideration pursuant to *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015) and *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020).

### I.    Claims Asserted and Procedural History

The Plaintiffs brought this action under Section 7(a) of the FLSA, 29 U.S.C. § 207(a), to recover unpaid overtime compensation for hours worked in excess of 40 in a workweek.

---

[1] Plaintiffs' counsel will notify the Plaintiffs of the date of the Settlement approval conference once it has been set by the Court.

[2] There are currently approximately 4,000 SSAs employed by Defendants, and 3,880 SSA's joined the lawsuit by individually submitting retainer agreements with Plaintiffs' Counsel. Thus, this settlement provides a significant recovery for the vast majority of all eligible employees.

Specifically, Plaintiffs allege that Defendants violated the FLSA as follows: 1) failing to pay the Plaintiffs assigned to work at schools (School-Based SSAs) and on the Mobile Task Force (MTF) for overtime work performed before their paid shifts (Pre-Shift Claim); 2) failing to pay the School Based SSAs and MTF Plaintiffs for overtime work performed during their uncompensated 30-minute meal periods (Meal Period Claim); 3) failing to pay the Plaintiffs for uncompensated overtime work performed when travelling between worksites (Travel Time Claim); 4) improperly calculating Plaintiffs' regular rate of pay (Regular Rate Claim); 5) failing to pay overtime in a timely manner (Delayed Payment Claim); and 6) improperly paying Plaintiffs at the straight time rate, rather than the overtime rate (Straight Time Claim). Plaintiffs alleged that Defendants' conduct lacked good faith and reasonableness thus entitling Plaintiffs to liquidated damages in an amount equal to their backpay, and that Defendants willfully violated the law, thereby extending the statute of limitations from two to three years.

The Court approved a Joint Stipulation on Discovery in which the parties agreed to use 103 randomly selected Plaintiffs for purposes of conducting discovery ("Phase One Plaintiffs"). DE 98. Discovery was extensive, costly and robust. Phase One Plaintiffs participated in written discovery, and Defendants deposed 51 Phase One Plaintiffs, and the Plaintiffs' expert witness on damages. Plaintiffs took depositions pursuant to FRCP 30(b)(6) on 57 topics related to Defendants' Documents and Processes, the Plaintiffs' Job Duties and Meal Periods, Timekeeping and Payroll, FLSA Training, and FLSA Compliance. Additionally, Plaintiffs deposed Defendants' expert witness.

After discovery, the parties cross-moved for summary judgment. On February 12, 2020, the Court issued a decision which denied in part and granted in part each of the motions. The Court granted the Plaintiffs' summary judgment motion in part on the Plaintiffs' Travel Time Claim, Regular Rate Claim and Straight Time Claim. Dkt. 204. Plaintiffs' motion was denied as to all other claims. For Defendants' motion, the Court granted Defendants' motion with respect to the pre-shift and meal-period claims brought by Borough Command SSAs and denied the motion as to all other claims. The Court found that issues of fact required that liability with respect to Plaintiffs' Pre-Shift, Meal Period, Delayed Payments Claims, and the issue of willfulness be tried to a jury, and that fact issues also prevented a ruling on liquidated damages. Dkt. 204. All damages claims were to be tried by a jury. Dkt. 204.

Plaintiffs also moved for a finding that they were similarly situated, which Defendants opposed. Dkt. 205. On February 26, 2020 the Court granted the Plaintiffs' motion and certified the following collective action for trial:

[A]ll current and former School Safety Agents ("SSAs"), employed by the New York City Police Department's School Safety Division at some point since June 8, 2014, who have consented to join this action, for the litigation of the Regular Rate, Prompt

Payment and Straight Time Claims, as defined above. The collective is divided into three sub-groups as follows, for the litigation of the following claims:

- School-Based SSAs for all aspects of the Off the Clock Claim,
- MTF SSAs for all aspects of the Off the Clock Claim and
- Borough Command SSAs for the travel-time portion of the Off the Clock Claim.

Dkt. 205, p.16.

On March 9, 2020, the Court issued a trial scheduling order setting pre-trial filing deadlines and setting this case for trial to begin on May 4, 2020. Dkt. 206. Shortly thereafter, the parties began arms-length settlement negotiations.

Plaintiffs' Counsel informed all Plaintiffs that a Settlement Team comprised of 6 Phase One Plaintiffs ("Settlement Team") had been selected. Thereafter, the parties engaged in several weeks of negotiations, with Plaintiffs' Counsel conferring with the Settlement Team throughout the process.

On April 17, 2020, the parties reached an agreement in principle on all claims, including backpay, liquidated damages, attorneys' fees and expenses, and service awards, which were all approved by the Settlement Team. The parties ultimately finalized all settlement terms and executed the Settlement Agreement on April 27, 2020.

All 3,880 Plaintiffs have been notified of the terms of the Settlement, including the total amount of backpay and liquidated damages to be paid, the methodology for calculating individual settlement proceeds, the amount of service awards, and the amount of attorneys' fees and expenses to be paid out of the $27,747,075.22 Settlement Amount. Elkin Decl., ¶ 12. There have been no objections to the Settlement amounts by any of the 3,880 Plaintiffs. *Id.*, ¶ 13.

## II.    Terms of the Proposed Settlement Agreement

The Agreement provides that Defendants will pay a total Settlement Amount of $27,747,075.22 to resolve the lawsuit. The Settlement Amount will be paid as follows: (1) a set of payroll checks and/or direct deposit payments made payable to each Plaintiff in accordance with Plaintiffs'' Counsel's instructions constituting his or her share of the backpay award in the amount of $13,789,357.12 ("the Backpay Amount"); and (2) one check in the amount of $13,957,2718.10 constituting liquidated damages, attorneys' fees, litigation expenses and Service Awards payable to Plaintiffs' Counsel ("Lump Sum Amount").

Plaintiffs and their Counsel have an agreement regarding the distribution of the Lump Sum Amount which is reflected in the Settlement Agreement.   The Lump Sum Amount will be distributed as follows: (1) $4,549,006.98 in net liquidated damages; (2) $57,000.00 in service awards for the Settlement Team, who will each receive $2,000.00 as a Service Award, and to the

45 Plaintiffs who served the class by participating in discovery and depositions ("Discovery Plaintiffs") who will each receive $1,000.00 ("the Service Award Amount"); (3) $154,029.05 in out of pocket expenses, including unreimbursed settlement administration expenses, to Plaintiffs' Counsel; and (5) a 33 1/3% contingency fee to Plaintiffs' Counsel in the amount of $9,197,682.07 calculated after expenses are deducted.  Each Plaintiff individually agreed to a 33 1/3% contingency fee when they retained the law firms.

The backpay and net liquidated damages portion of the Settlement Amount were calculated by Plaintiffs' Counsel and are divided among the Plaintiffs as follows:  For each week a Plaintiff worked as an SSA during the recovery period, the Plaintiff received one point. The recovery period is calculated for each Plaintiff by going back three years from the date a Plaintiff's consent-to-sue form was filed in Court up to April 22, 2020, or their last day of employment, whichever is earlier. Exhibit A to the Settlement is a preliminary draft of the Plaintiffs' distribution amounts after attorneys' fees and expenses are deducted.[3]  The points were then divided into $18,338,364.10, which reflects the Net Settlement Fund (backpay and net liquidated damages) after attorneys' fees, litigation expenses, and Service Awards are deducted, to determine the dollar value of a point.[4]

---

[3] Plaintiffs' Counsel notified all plaintiffs of their preliminary settlement amounts and point totals, which are based on Defendants' payroll records.  Plaintiffs have until May 15, 2020 to raise disputes, including twelve individuals whose payroll records do not reflect that they worked as SSAs during their recovery period.  These individuals have been notified that they will be dismissed from this case if they cannot provide documentation that they worked as SSAs during the recovery period. Accordingly, if none of the twelve individuals can show that they worked as SSAs during the recovery period by May 15, Exhibit A will be revised to remove these individuals, who are now listed as receiving zero damages.  In addition, the parties agree that Exhibit A will be revised to account for any point adjustments based on valid disputes. For example, Plaintiff Tressa Cook was inadvertently dismissed from the case in November 2018 but demonstrated to Plaintiffs' Counsel that she worked as an SSA Level 1 during the entire recovery period, and Defendants have agreed that she should be included as a Plaintiff and will be included in the final Exhibit A. Likewise, upon receiving her settlement notice, Plaintiff Vanessa Bailey reported to Plaintiffs' Counsel that she worked as an SSA Level III the entire recovery period so she will be dismissed from the case and not receive the settlement amount currently listed for her on Exhibit A. The parties will submit the final Exhibit A to the Court before the Settlement Approval Conference.

[4] The methodology of using weeks of employment during the relevant statute of limitations period to determine the Plaintiffs' amounts is the methodology used in other FLSA cases involving complicated off-the-clock claims and a variety of different claims wherein the risks and valuations concerning on which claims and the amounts of time the Plaintiffs may win are difficult to separately quantify for each Plaintiff and for each claim. *E.g., Perry v. City of New York*, Case 1:13-cv-01015 (VSB) (S.D.N.Y. February 13, 2020) (approving settlement agreement for FDNY Fire Inspectors using same distribution methodology); *Jones v. New York City Housing Authority*, 1:17-cv-3683 (JGK) (S.D.N.Y. December 17, 2018) (approving FLSA settlement agreement for NYCHA housing assistants using same distribution method); *Brown v. New York City Housing Authority*, 1:16-cv-9263(RA) (S.D.N.Y. September 14, 2018) (approving FLSA settlement

Page 5 of 21
Hon. Lorna G. Schofield

Paragraph 2.4 of the Agreement provides that Plaintiffs have entered into individual agreements with Plaintiffs' Counsel. These agreements provide for a contingency attorney fee amount equal to thirty-three and one-thirty percent (33 1/3%) of the Settlement Amount calculated after all expenses (inclusive of unreimbursed settlement administration expenses) are deducted from the Settlement Amount. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $9,197,682.07 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel

In consideration and exchange for this Settlement, the Plaintiffs agree to release the Defendants for all wage and hour claims through April 22, 2020.

Each Plaintiff has been informed, in writing, of the methodology for assigning points and the number of points calculated for them using the Defendant's payroll data. Each Plaintiff has been given an opportunity to dispute the number of points assigned and to review the point assignments and settlement awards of all other Plaintiffs. There have been no disputes or objections. The reaction of the collective has been overwhelmingly positive.

## III.    Applicable Factors for Approving FLSA Settlements

A settlement in an FLSA collective action is not effective unless it is approved by either a district court or the United States Department of Labor. *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020); *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015). "As a result, district courts in this Circuit routinely review FLSA settlements for fairness before approving any stipulated dismissal." *Id.* "Generally, there is a strong presumption in favor of finding a settlement fair, because the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Lliguichuzhca v. Cinema 60, LLC,* 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (internal quotation marks omitted).

"In determining whether to approve proposed FLSA collective action settlements, courts are mindful of the fact that 'FLSA collective actions do not implicate the same due process concerns as Rule 23 actions.'" *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2011 WL 754862, at *5 (E.D.N.Y. 2011). Unlike Rule 23 class actions where failure to affirmatively opt-out results in a class member being bound by an approved class settlement, in an FLSA action like this one, an eligible individual who decides *not* to join is not a party to the case, and as such, is not bound in any way by the settlement agreement, or the final judgment in a case. As such, "[c]ourts approve FLSA settlements when

---

agreement for 856 NYCHA maintenance workers and heating plant technicians using same distribution method); *Johnston v. New York City Housing Authority,* 1:16-cv- 9924 (S.D.NY. January 19, 2018)(approving settlement agreement using same distribution methodology at issue here for NYCHA Exterminators); *Small v. City of New York,* 1:14-cv-3469 (S.D.N.Y. May 15, 2015) (approving settlement of FLSA claims by NYPD police sergeants using same distribution methodology used here); *Mullins v. City of New York*, 1:06 cv 20238 (SAS) (same).

Page 6 of 21
Hon. Lorna G. Schofield

they are reached as a result of contested litigation to resolve bona fide disputes.'" *Id.* (quoting *Beckman*, 293 F.R.D. at 476). "Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement." *Beckman*, 293 F.R.D. at 476.

Courts evaluating whether FLSA settlements are reasonable consider the following factors:

(1) the plaintiffs' range of possible recovery;
(2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses;
(3) the seriousness of the litigation risks faced by the parties;
(4) whether the settlement is the product of arm's-length bargaining between experienced counsel; and
(5) the possibility of fraud or collusion.

*Wolinsky*, 900 F. Supp. 2d at 336; *Fisher*, 948 F.3d at 599-600 ("District courts typically evaluate the fairness of a settlement agreement by considering the factors outlined in *Wolinsky*…."). Importantly, under the Second Circuit's recent *Fisher* decision, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Fisher,* 948 F.3d at 606.

### a.  Application of the *Wolinsky* Factors to the Settlement

As discussed below, the proposed Settlement is fair and reasonable to Plaintiffs and Defendants.

### i.  Plaintiffs' Possible Range of Recovery

The Settlement results in a non-reversionary $18,338,364.10 Net Settlement Fund for the 3,880 Plaintiffs. Plaintiffs believe the Net Settlement Fund, which is the amount to be distributed to the Plaintiffs after fees, expenses, and service awards are deducted, represents 63% of the Plaintiffs' total claimed damages using a full 3-year recovery period and a full award of liquidated damages. Elkin Decl., ¶ 14.  The average net settlement amount to the 3,880 individual Plaintiffs is **$4,726.38**. Elkin Decl., ¶ 17.

Considering the risks associated with trying the remaining claims, and establishing collective-wide damages, this amount is clearly reasonable. *See Rojas v. Pizza Pete's LLC*, 2019 U.S. Dist. LEXIS 149717, 2019 WL 4447578, at *5 (net settlement of 36% of total alleged damages after deducting costs and counsels' 1/3 contingency fee is "clearly reasonable given the uncertainties inherent in any litigation"); *Chowdhury v. Brioni America, Inc.*, 2017 WL 5953171, at *2 (S.D.N.Y. 2017) (net settlement of 40% of FLSA plaintiffs' maximum recovery is reasonable); *Redwood v. Cassway Contracting Corp.*, 2017 WL 4764486, at *2 (S.D.N.Y. 2017) (net settlement of 29.1% of FLSA plaintiffs' maximum recovery is reasonable); *Felix v. Breakroom Burgers & Tacos*, 15 Civ. 3531, 2016 U.S. Dist. LEXIS 30050, 2016 WL 3791149 at

*2 (S.D.N.Y. 2016) (net settlement of 25% of FLSA plaintiff's maximum recovery is reasonable).

The Settlement Amount is based on the damages calculations prepared by the Plaintiffs' expert damages witness, Dr. Louis Lanier, which were reviewed by Defendant's expert witness, Dr. Christopher Erath, as part of the parties' arms-length negotiations. The Settlement Amount is based on a three-year statute of limitations on all claims (i.e., three years prior to the date each Plaintiff's consent-to-join form was filed in court through April 22, 2020, or the Plaintiff's last date of employment with the Defendants, whichever is earlier). Elkin Decl., ¶ 16. To achieve this outcome at trial, Plaintiffs would have been required to prove that Defendants willfully violated the law; otherwise, a two-year statute of limitations would apply. 29 U.S.C. § 255 (a). *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

The chart below demonstrates the value of the claims assigned by the parties to enter into the Settlement:

| Claim | Back Pay | Liquidated Damages |
|-------|----------|--------------------|
| Regular Rate (all Plaintiffs) | $70,899.77 | $70,899.77 (100%) |
| Straight Time (all Plaintiffs) | $1,909.54 | $1,909.54 (100%) |
| Prompt Payment (all Plaintiffs) | | $1,545,817.43 (75%) |
| Pre-Shift (School-Based and MTF SSAs) | $6,166,973.67 | $4,625,230.25 (75%) |
| Travel Time (all Plaintiffs) | $1,516,121.90 | $1,516,121.90 (100%) |
| Meal Claim (School-Based and MTF SSAs) | $6,033,452.24 | $4,525,089.18 (75%). |
| **Totals** | $13,789,357.12 | $12,285,068.14[5] |

A discussion of the settlement amounts obtained and the associated litigation risks with respect to each claim is set forth below.

***Full Relief on Claims Decided at Summary Judgment***. The Plaintiffs won summary judgment on liability on the Regular Rate Claim, Straight Time Claim, and Travel Time Claim. The jury was left to decide the amount of backpay owed as a result of these violations, as well as whether a three or two-year recovery period applied. The Court would have then determined whether liquidated damages were owed. On all three of these claims, the settlement amount of $3,177,862.42, accounts for three years of full backpay damages, as well as a full award of liquidated damages equal to the backpay. The calculation of damages for these, and all other claims, was based on the City's payroll and timekeeping data for all Plaintiffs. For the Travel Time Claim, the calculation was based on actual minutes reflected in Plaintiffs' timekeeping data between punch out at work location one and punch back in at work location two and was capped at one-hour per-day.

---

[5] Thus, the total backpay and liquidated damages agreed to by the City to resolve this case is $26,074,425.22. The City agreed to expenses and fees in the amount of $1,672,650.00. This amount was added to the $26,074,42.22 to arrive at the total settlement fund of $27,747,075.22.

Page 8 of 21
Hon. Lorna G. Schofield

*Delayed Payment of Overtime*. On the Plaintiffs' Delayed Payment Claim, which would require the Plaintiffs to prove at trial that the Defendants, and not the Plaintiffs, caused a delay in the payment for approved overtime work, Defendants agreed to pay liquidated damages equaling 75% of the amount Plaintiffs sought to recover at trial. The damages associated with the Delayed Payment Claim are liquidated damages to compensate the Plaintiff for the delayed, but eventual, payment for the overtime work. Accordingly, payment of $1,545,817.43 equals 75% of the maximum possible recovery on this claim. Plaintiffs faced risk at trial on this claim because it required the Plaintiffs to prove it was Defendants' actions, and not the Plaintiffs' (e.g., by failing to timely submit requests for overtime work), that resulted in delayed payment.

*Pre-Shift Claim*. The settlement amount of $10,792,203.80 for the Pre-Shift Claim for School-Based SSAs with a start-time of 7:00 a.m. or earlier (i.e., those who testified regarding "set up" tasks in their position) and MTF SSAs reflects 15 minutes of unpaid overtime per each shift worked for each Plaintiff plus 75% of that amount as liquidated damages. The School-Based SSAs represent 94.1% of the Plaintiffs and 5.3% of Plaintiffs work as MTF SSAs. Of the 94.1% of the School-Based SSAs, 46% have shift start times of 7:00 a.m. or earlier. The damages calculation for this claim was based on these numbers. Given the Court's decision on summary judgment, no damages were calculated for pre-shift work for Borough Command SSAs. Plaintiffs note that the backpay associated with these claims represents the same backpay amounts Plaintiffs would have sought at trial (i.e., $6,166,973.67 as reflected on the above chart). Plaintiffs faced significant risk at trial because the Plaintiffs carry the burden of proving that they routinely performed uncompensated pre-shift work in these assignments. The settlement amount includes liquidated damages on this claim equal to 75% of the backpay amount.

*Meal Period Claim*. The settlement amount of $10,558,541.40 for the Meal Period Claim reflects one missed meal period per week (i.e., 30 minutes of overtime pay) for school-based SSAs, and two missed meal periods per week (i.e., 60 minutes of overtime pay) for MTF SSAs. As per the Court's summary judgment, no damages were calculated for Borough Command SSAs for meal period damages. The Plaintiffs faced risk on this claim because, at trial, the Plaintiffs carry the burden of proving they performed uncompensated work with Defendants' knowledge, and that this unpaid work resulted in damages. Plaintiffs note that this settlement amount represents the backpay amounts Plaintiffs would have sought at trial (i.e., $6,033,452.24 as reflected on the above chart). The settlement amount includes liquidated damages on this claim equal to 75% of the backpay amount as liquidated damages.

For the Pre-Shift and Meal Period Claims, if Plaintiffs were successful in meeting their burden at trial, it is possible that the jury could have awarded fewer minutes per-day of pre-shift overtime, or fewer minutes per week in unpaid meal periods. Significantly, even if the jury ruled in Plaintiffs' favor, the jury may have found that these violations were not willful, resulting in a two-year rather than three-year recovery period, and it is possible that the Court may not have awarded liquidated damages.

In light of this range of recovery as compared to the amounts provided for under the Settlement Agreement, this Settlement represents an excellent result for the Plaintiffs on **all** claims asserted in this action.

### ii.   Avoiding Anticipated Burdens and Expenses

Litigating FLSA claims and damages at trial would be a fact-intensive process demanding additional costly litigation by both parties.  Without this Settlement, both parties would need to spend significant time and resources to prepare for a multi-week trial, including meeting with and preparing numerous Discovery Plaintiffs for trial testimony, preparing trial exhibits, preparing motions in limine, preparing pre-trial briefing, drafting jury instructions, voir dire, and a verdict form, preparing opening statements, presenting the case to a jury, preparing summation, presenting the issue of liquidated damages to the Court for a decision, likely  post-trial motions practice, and possible appeal. In short, the anticipated burdens and expenses on both parties were significant.

### iii.   Seriousness of Litigation Risks

As noted above, there was no guarantee of success on either side on the claims that resulted in the most significant damages to the Plaintiffs: the Plaintiffs' Pre-Shift Claim and Meal Period Claim, as well as the issues of whether the Defendants' violations on all claims were willful, and lacked good faith in reasonableness.  Given the uncertainty over the potential outcome, both parties were motivated to settle this dispute.

### iv.   Arm's-Length Bargaining

Both parties engaged in good faith, arm's-length negotiation in reaching this Settlement. Counsel for both parties negotiated settlement terms over the course of several weeks, until a tentative settlement was reached.  Plaintiffs' expert witness analyzed detailed payroll information and timekeeping records and shared those calculations and all underlying programing with Defendants.  Defendants' expert reviewed and analyzed Plaintiffs' damages calculations and these calculations were relied upon by the parties to negotiate the settlement amount.

Ultimately, the parties reached an agreement in principle and the settlement terms were then approved by the Settlement Team.  In addition, all Plaintiffs have been informed of the Settlement and its terms, and they have been informed of their opportunity, if they so choose, to object to the settlement terms on an individual basis. In addition, they were informed of the settlement distribution methodology and had an opportunity to dispute the number of recovery period weeks assigned to them, and to review the amounts and weeks allocated to each and every Plaintiff. **No Plaintiff has lodged any objection to the Settlement.**

### v.   Possibility of Fraud or Collusion

Given the parties' arms-length negotiating and the parties' good faith participation in settlement discussions, there was no opportunity for fraud or collusion.  The parties represented

Page 10 of 21
Hon. Lorna G. Schofield

their clients zealously and obtained what both parties consider to be a fair and reasonable Settlement consistent with standards established in the Second Circuit for FLSA collective action settlements.

**b. The Service Awards to the Settlement Team and Discovery Plaintiffs are Appropriate[6]**

Courts in this Circuit have recognized that, " [i]n FLSA collective actions, just as in Rule 23 class actions, service awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *See, e.g., Sanz v. Johnny Utah 51 LLC*, 2015 WL 1808935 (S.D.N.Y. 2015) (quoting *Diaz v. Scores Holding Co., Inc*., 2011 U.S. Dist. LEXIS 112187, 2011 WL 6399468 at at *3-4 (S.D.N.Y. 2011)). This Court has regularly approved service awards to representative plaintiffs totaling up to 9.1% of the settlement amount. *See, e.g., Johnson v. Brennan,* 2011 WL 6399468, at *2, 21 (S.D.N.Y. 2011) (incentive payments totaling 9.1% of a $440,000 FLSA/NYLL settlement).

The Service Awards will be provided to the six Settlement Team members, and 45 Discovery Plaintiffs, all of whom served the class by participating in extensive discovery. Nobile Decl., ¶¶ 6-13; Nobile Decl., Ex. A (Declarations from Plaintiffs). Each Settlement Team member will receive $2,000, for a total of $12,000, and each Discovery Plaintiff will receive $1,000, for a total of $45,000. Settlement, ¶ X. Therefore, the Service Awards **total $57,000** and equal less than two tenths of one percent (00.20%) of the **$27,747,075.22** Settlement Amount. Nobile Decl., ¶ 14. All 3,880 Plaintiffs have been informed of these payments, and none have objected to the Service Awards. Nobile Decl., ¶ 15.

The Settlement Team and 45 Discovery Plaintiffs spent time investigating and responding to written discovery requests, searching for documents, meeting with counsel to discuss their claims, meeting with counsel to prepare for depositions, and sitting for lengthy depositions, where they described the unpaid work they performed, and how their claims stem from Defendants' common policies and practices. The time and effort exerted by Discovery Plaintiffs resulted in a significant benefit to the class – namely, a decision in Plaintiffs' favor on certain issues at summary judgment, and a decision that the Plaintiffs' case could be presented to the jury through representative testimony because the Discovery Plaintiffs were similarly situated to the other Plaintiffs within three subgroups. In addition, the Settlement Team invested additional time participating in the settlement discussions including conferring with Plaintiffs' Counsel, reviewing damages calculations, assessing the various settlement proposals and counter proposals and facilitating in recommending a settlement to the other plaintiffs. A detailed declaration from counsel, as well as a detailed declaration from each of the Plaintiffs for whom a Service Award is assigned are attached. Nobile Decl., Ex. A

---

[6] Defendants take no position regarding the Service Awards provided to the Settlement Team and Discovery Plaintiffs as these awards are made pursuant to agreements solely between Plaintiffs' and their counsel.

Page 11 of 21
Hon. Lorna G. Schofield

For all 51 Plaintiffs receiving Service Awards, these activities required time off of work, and commuting to meet their discovery obligations. Nobile Decl., ¶ 12). As first line security personnel workers receiving a modest wage, any time off from work has a material impact on their standard of living and their investment of time to assure a positive outcome in this case is noteworthy.  Nobile Decl., ¶ 12.

As this Court explained in awarding service payments to plaintiffs involved in filing and litigating a similar claim, "in a wages and hours case, where a low level employee assumes responsibility for prosecuting an action against an employer and takes considerable personal risk in so doing, such awards are singularly appropriate." *Henry*, 2014 U.S. Dist. LEXIS 72574, 2014 WL 2199427 at *11.[7] Service awards "fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take." *Flores v. Anjost Corp.*, 2014 WL 321831, at *27 (S.D.N.Y. 2014). As such, service awards are common in the Second Circuit. *See, e.g.*, *Bryant v. Potbelly Sandwich Works, LLC*, 2020 WL 563804, at *22 (S.D.N.Y. 2020) (approving service awards between $2,500 and $5,000 to participating plaintiffs); *Cruz v. Sal-Mark Rest. Corp.*, 2019 WL 355334 at *21 (N.D.N.Y. 2019) (approving as reasonable $5,000 service award to plaintiff); *Sealock v. Covance, In*c., Civil Action No. 17-cv-5857 (JMF), 2020 U.S. Dist. LEXIS 44753, at *11-12 (S.D.N.Y. 2020) (approving $10,000 service award to plaintiff).

Here, the Settlement Team and Discovery Plaintiffs took a risk in not only coming forward and suing their employer but in being actively engaged in the litigation and confronting their employer about their allegedly unlawful practices. They were each deposed and faced extensive questioning from experienced City Law Department litigators as well as litigators from Sullivan & Cromwell. Nobile Decl., ¶ 13. Their willingness to serve the class as Settlement and Discovery Plaintiffs achieved favorable results for 3,829 additional Plaintiffs (e.g., median individual settlement amount is **$5,270.18** *after* fees and expenses are deducted).  *Id.* Under well-established Second Circuit precedent, the Settlement Team and Discovery Plaintiffs, are entitled to the Service Awards sought in this settlement.

### c.  Attorneys' Fees and Costs[8]

Each of the 3,880 Plaintiffs signed a written contract in which they agreed to a 33 1/3% contingency fee when they retained the law firms handling this case. McGillivary Decl., ¶ 5. Accordingly, under the Settlement, after expenses in the amount of $154,028.78 are reimbursed, Plaintiffs' Counsel will be paid $9,197,682.07, which represents a 33 1/3% contingency fee of the Settlement net of costs. *See Run Guo Zhang v. Lin Kumo Japanese Rest., Inc.*, 2015 WL 5122530 at *1 (S.D. N.Y. 2015) ("The Court's view is that attorneys' fees, when awarded on a percentage basis, are to be awarded based on the settlement net of costs**.**").

---

[7] Copies of decisions that are unavailable on Westlaw are attached as Exhibit 7.

[8] As per the Settlement Agreement, Plaintiffs have entered into individual agreements with Plaintiffs' Counsel which contain contingency fee provisions.  The City is not a party to these agreements.  As such, Defendants take no position regarding Section III(c) of this letter.

> i. **Percentage of the Fund Awards Are Favored and the Amount Sought in this Matter is Similar to Court-Approved Fees in Similar Percentage of the Fund Cases**

The Second Circuit favors the use of the contingent percentage of the fund method to compensate attorneys in overtime wage and hour actions. *See, e.g. McDaniel v. County of Schenectady,* 595 F.3d 411, 417 (2d Cir. 2010); *Wal-Mart Stores, In. v. Visa U.S.A., Inc.* 396 F.3d 96 (2d Cir. 2005). The reasoning behind this is straightforward: "[T]he percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Monserrate v. Tequipment, Inc.*, 2012 WL 5830557 at *3 (E.D.N.Y. 2012). That "powerful incentive" is the very real possibility that plaintiffs' counsel will not recover any fees whatsoever. *Butt v. Megabus Ne. LLC*, 2012 U.S. Dist. LEXIS 137683 at *22 (S.D.N.Y. 2012) ("Class Counsel risked time and effort and advanced costs and expenses, with no ultimate guarantee of compensation. [Therefore, a] percentage-of-recovery fee award of 33.3% is consistent with the Second Circuit's decision").

 "Attorneys who fill the private attorney general role must be adequately compensated for their efforts. If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk. Adequate compensation for attorneys who protect wage and hour rights furthers the remedial purposes of the FLSA and NYLL." *Deleon*, 2015 U.S. Dist. LEXIS 65261, 2015 WL 2255394 at * 5 (FLSA and New York labor law claims) (citing *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 51 (2d Cir. 2000) for "commending the general 'sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.'"); *See Bozak v. FedEx Ground Package Sys.*, 2014 WL 3778211, at *16 (D. Conn. 2014) ("Fee awards in wage and hour cases are meant to "encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel."); *Capsolas v. Pasta Resources Inc.*, 2012 WL 4760910, at *8 (S.D.N.Y. 2012) (fee request of one-third is "consistent with the norms of class litigation in this circuit"). As such, evaluating the amount of fees provided for in a settlement agreement using the "percentage-of-recovery" method is consistent with the "trend in this Circuit." *Bannerman v. Air-Sea Packing Grp.*, 2020 WL 408350, at *3 (S.D.N.Y. 2020) (approving attorneys' fees of 33 1/3%).

#### 1. Private Fee Agreements Should be Honored

Consistent with the Second Circuit's disposition toward contingency fee agreements is its favorable position toward private fee agreements. By enforcing such agreements, the court provides low income and individual plaintiffs with a powerful tool for enforcing their rights. As the Supreme Court has explained in the civil rights context, "[Nothing] in the legislative history … persuades us that Congress intended § 1988 to limit civil rights plaintiffs' freedom to contract with their attorneys." *Venegas v. Mitchell*, 495 U.S. 82, 87 (1990). This is because "depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in civil rights cases to secure competent counsel." *Id.* at 89-90. Therefore, the fee-shifting provision

Page 13 of 21
Hon. Lorna G. Schofield

of § 1988 "controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." *Id.* at 90. The same holds true in the fee shifting context of the FLSA.[9]

Moreover, courts in this circuit recognize that where small claims can only be prosecuted through aggregate litigation such as in the instant FLSA case, attorneys who fill the "private attorney general" role must be compensated for their efforts through enforceable contingent fee agreements. *See, e.g., Viafara v. MCIZ Corp.,* 2014 WL 1777438 at *27-28 (S.D.N.Y. 2014)(approving 33 1/3 % fee consistent with norms of fee shifting litigation in Second Circuit); *Zeltser v. Merrill Lynch & Co.*, 2014 WL 4816134, at *9 (S.D.N.Y 2014) (same); *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 WL 3778173, at *4 (S.D.N.Y. 2014) (same);*Clem v. KeyBank, N.A.*, 2014 WL 2895918, at *10-11 (S.D.N.Y. 2014)(same). Indeed, many individual litigants, including the Plaintiffs here, likely "cannot afford to retain counsel at fixed hourly rates . . . yet they are willing to pay a portion of any recovery they may receive in return for successful representation." *deMunecas v. Bold Food, LLC*, 2010 U.S. Dist. LEXIS 87644, 2010 WL 3322580 at *21-22 (S.D.N.Y. 2010) (quoting *In re Abrams*, 605 F.3d 238, 245-46 (4th Cir. 2010)).

Here, each of the 3,880 Plaintiffs entered into a private fee agreement to pay their "private attorneys general" a 33 1/3 percent contingency fee.[10] There are no "absent" class members in this case.  Instead, all 3,880 Plaintiffs knew about the 33 1/3% contingent fee at the start of the case, signed a contract agreeing to pay it, and have been informed about the amount they will now pay once the Court approves the settlement.  No Plaintiff has objected to the fee or expenses. For all of these reasons, this Court should "enforce the parties' intentions in a contingent fee agreement, as with any contract."  *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999).

---

[9] *See e.g., Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, fn 4 (2d Cir. 2007) (in ADEA case, which incorporates same fee-shifting provision as FLSA, Court concluded  that attorney and client should be able to settle distribution of the attorney's fees "according to their own contract terms, which are beyond the province of this Court."); *Samaroo v. Deluxe Delivery Sys.*, 2016 U.S. Dist. LEXIS 34742, 2016 WL 1070346 at *9 n.4 (S.D.N.Y. 2016) (approving attorneys' fees and costs of more than 34% of the settlement noting that "I do not address the fee arrangement between plaintiffs and their counsel because I do not believe I am required to do so under *Cheeks*. As described in *Cheeks*, the purpose of the FLSA is to regulate the relationship between an employee and his employer and to protect the employee from over-reaching by the employer.  I do not understand the FLSA to regulate the relationship between the employee as plaintiff and his counsel or to alter the freedom of contract between a client and his attorney."); *Chowdhury v. Brioni Am., Inc.*, 2017 U.S. Dist. LEXIS 196469, 2017 WL 5953171 at *15-16 (S.D.N.Y. Nov. 29, 2017)("Finally, pursuant to a retainer agreement signed by plaintiffs, plaintiffs' counsel will receive one third of the settlement proceeds, exclusive of counsel's out-of-pocket costs, for contingency fees. Contingency fees of one-third in FLSA cases are routinely approved in this Circuit.").

[10] A copy of the contingency fee agreement signed by Plaintiff Worley (with Personally Identifiable Information redacted) is attached to the Declaration of Gregory K. McGillivary as Exhibit B. This is the same agreement each of the 3,880 Plaintiffs signed.

### 2. The Attorneys' Fees Sought in This Matter are in Line with Settlements of Similar Size, Complexity and Subject Matter

As courts in this circuit have repeatedly recognized, "When using a 'percentage of the fund' approach, 'courts regularly approve attorney's fees of one-third of the settlement amount in FLSA cases.'" *Xiao v. Grand Sichuan Intn'l St. Marks, Inc.*, 2016 U.S. Dist. LEXIS 99669, 2016 WL 4074444 at *3 (S.D.N.Y. Jul. 29, 2016) (citing *Meza v. 317 Amsterdam Corp.*, 2015 U.S. Dist. LEXIS 166890, 2015 WL 9161791 (S.D.N.Y. Dec. 14, 2015)). *See  Bryant v. Potbelly Sandwich Works, LLC*, 2020 U.S. Dist. LEXIS 21900, 2019 WL 1915298, at *15 (S.D.N.Y. Feb. 4, 2020) (in FLSA/Rule 23 hybrid, approving one-third of common settlement fund as "reasonable and well within the accepted range awarded in wage and hour cases in this District and throughout the Second Circuit"); *Cruz v. Sal-Mark Rest. Corp.*, 2019 U.S. Dist. LEXIS 13529, 2019 WL 355334 at *21 (N.D.N.Y. Jan. 28, 2019) (approving one-third fee, noting that a "presumptively reasonable fee takes into account what a reasonable, paying client would pay" and this "supports a one-third (33.33%) recovery in a case like this one where Class Counsel's fee entitlement is entirely contingent upon success"); *Chung v. Brooke's Homecare LLC,* 2018 WL 2186413, at *3-4 (S.D.N.Y. 2018) (awarding one-third fee, noting that "Courts routinely award 33.33% of a settlement fund as a reasonable fee in FLSA cases"); *Penafiel v. Babad Mgmt. Co., LLC,* 2018 U.S. Dist. LEXIS 66991, 2018 WL 1918613 at *9 (S.D.N.Y. Apr. 18, 2018) (awarding 33.3% fee, noting "Contingency fees of one-third in FLSA cases are routinely approved in this Circuit").

Not only is the contingent fee of 1/3 consistent with fees in wage cases in this Circuit, and what each of the Plaintiffs agreed to pay at the outset of this litigation, but the attorneys' fees requested here are in line with other settlements of a similar size, complexity and subject matter. Here, after deducting attorneys' fees, expenses, and service awards the Plaintiffs are recouping ***63% of their total possible recovery if successful at trial on all issues***. *See e.g., Davis v. J.P. Morgan Chase & Co*., 827 F. Supp. 2d 172, 178, 185-86 (W.D.N.Y. 2011) (awarding $14 million dollars in attorneys' fees, representing one-third of $42 million settlement fund in a Rule 23/FLSA hybrid involving "thousands of class members"); *Hart v. RCI Hosp. Holdings*, 2015 U.S. Dist. LEXIS 126934, 2015 WL 557713 at *5, *11, *44 (S.D.N.Y. 2015) (approving requested attorneys' fee of $4,928,949.74 representing 32.9% of the gross settlement amount of $15 million in 2,208-member FLSA/Rule 23 hybrid reversionary settlement where the average payment assuming full participation of the class was $4,255). [T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Fisher,* 948 F.3d at 606 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)) (internal quotation marks omitted).

### 3. As the Second Circuit Recently Explained, the Negotiated Terms of an FLSA Settlement Agreement Cannot Be Modified

In *Fisher v. SD Prot. Inc*., 948 F.3d 593, 605 (2d Cir. 2020), the Second Circuit clarified that there is no cap on the amount of attorneys' fees to be recovered in an FLSA settlement, and held that a district court abuses its discretion by rewriting and reallocating funds, including attorneys' fees, under a settlement agreement negotiated between the parties.

Page 15 of 21
Hon. Lorna G. Schofield

In *Fisher*, the district court approved the settlement amount as fair under *Cheeks*, but then proceeded to modify the allocation of the settlement funds as between the plaintiff and the defendant, imposing a one-third percentage cap on attorneys' fees. The Second Circuit held that such a cap is contrary to the FLSA because "in advancing Congress's goals under the FLSA to ensure a 'fair day's pay for a fair day's work,' the law cannot be read to impose a proportional limitation based on the perceived complexities of the litigation." *Fisher*, 948 F.3d at 603. As such, the court held that "in light of the text and purpose of the FLSA, as well as longstanding case law interpreting other similar fee-shifting statutes in the civil rights context, we conclude that the district court erred in imposing a proportionality limit on [plaintiff's counsel's] recoverable attorneys' fees." *Id.* at 605.

The Court held that "a district court may not simply rewrite the terms of a settlement agreement because a 'settlement agreement is a contract that is interpreted according to general principles of contract law.'" *Id.* at 605. "If the 'terms of a contract are clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself.'" *Id.* (*quoting Lilly v. City of New York*, 934 F.3d 222, 235 (2d Cir. 2019)). Thus, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Id.* at 606. The Court emphasized that "even though a district court has a duty to review an FLSA settlement for reasonableness to prevent any potential abuse, this does not grant the court authority to rewrite contract provisions it finds objectionable." *Id.* at 606.

Here, the Settlement provides:

Plaintiffs have entered into individual agreements with Plaintiffs' Counsel. These agreements provide for a contingency attorney fee amount equal to thirty-three and one-third percent (33 1/3%) of the Settlement Amount calculated after all expenses (inclusive of unreimbursed settlement administration expenses) are deducted from the Settlement Amount. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $9,197,682.07 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel.

Agreement, ¶ 2.4. This paragraph describes the contingency fee agreement to which each of the 3,880 Plaintiffs entered into when retaining Plaintiffs' Counsel. In *Fisher*, the settlement agreement was silent as to how the payment was to be divided between plaintiff and his counsel and the Second Circuit still ruled the lower court abused its discretion in rewriting the settlement agreement. Here, the Settlement Agreement explicitly describes Plaintiffs' Counsel's agreement with their clients, and any reallocation of the Settlement Funds would ignore the plain language of the settlement. Thus, under *Fisher*, any redistribution of settlement funds would interfere with the 3,880 contracts between Plaintiffs and their Counsel. Moreover, the Settlement provides an excellent recovery for the Plaintiffs and approval of the Settlement, in its entirety, will provide these 3,880 essential workers with settlement proceeds in the median amount of $5,270.18, ***after***

fees and expenses are deducted (Elkin Decl., ¶ 18), within 90 days of Court approval. As described above, Plaintiffs individually agreed to the 33 1/3% contingency fee at the outset of the litigation[11] and have been notified of how that agreed upon fee has been applied to the Settlement, and not a single Plaintiff has objected to that fee as part of the overall Settlement Agreement reached by the parties. Accordingly, the Court should find that the Settlement, inclusive of the 33 1/3 % contingency fee is a fair and reasonable resolution of this case.

### ii. The Fee is Reasonable Based on "Traditional Criteria"

In determining a reasonable award of attorneys' fees, this Court will also consider the "traditional criteria" such as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement and (6) public policy considerations. *Goldberger*, 208 F. 3d 43, 50 (2d Cir. 2000) (internal quotations omitted). An analysis of these criteria further support the fee requested, in addition to Plaintiffs' individual contingency fee agreements with Plaintiffs' counsel as described above.

### 1. The Litigation was Complex

"The size and difficulty of the issues in a case are significant factors to be considered in making a fee award." *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 U.S. Dist. LEXIS 105596, 2014 WL 3778173 at *10 (S.D.N.Y. 2014). Here, given the size of the collective, and the sophistication of the employer and its policies, this case did not represent a straightforward FLSA claim where a single employee seeks compensation for an easily defined amount of unpaid work. It involved thousands of Plaintiffs, working across the five boroughs in different public schools, each of whom brought forth multiple claims. As a result, this litigation was complex, and Plaintiffs' Counsels' expertise greatly benefitted the 3,880 plaintiffs.

To start, the case involved a thorough investigation by Plaintiffs' counsel to determine the extent of the violations. Additionally, given that the Defendants intended to move to dismiss the claims if each of the 3,880 Plaintiffs failed to allege specific workweeks in which they were suffered or permitted to perform uncompensated work, and/or experienced the violations alleged in the Regular Rate, Straight Time, Delayed Payment, and Travel Time claims, Plaintiffs' Counsel entered into a stipulation in which Defendant provided early discovery in the form of payroll and time records, and Plaintiffs prepared and filed a Second Amended Complaint with 6 attachments comprised of 2,604 pages in which the Plaintiffs for whom Defendants produced data alleged 121,205 discrete FLSA violations in specific workweeks across the recovery period. Dkt. 88.

Following Defendants' Answer, formal discovery began, and the process was time

---

[11] When considering the reasonableness of fees, the district court should consider "the consequent risk of non-payment viewed *as of the time of filing the suit*." *Henry v. Little Mint, Inc.*, 2014 U.S. Dist. LEXIS 72574, 2014 WL 2199427 at *43 (S.D.N.Y. 2014) (emphasis added). *See Sewell v. Bovis Lend Lease LMB, Inc.*, 2012 WL 1320124 at *37-38 (S.D.N.Y. 2012); *Johnson*, 2011 U.S. Dist. LEXIS 105775, 2011 WL 4357376 at *58. In other words, a court should credit counsel for bearing the risk of litigation prior to any guarantee of success.

consuming and multifaceted. Defendants took written discovery from the Phase One Plaintiffs, seeking numerous documents and propounding extensive interrogatories. Additionally, Defendants deposed 51 Phase One Plaintiffs in this matter. Plaintiffs' counsel met with each of these 51 Plaintiffs to explain the deposition process and defend their depositions. Plaintiffs' Counsel also deposed the Defendants' FRCP 30(b)(6) witnesses on 57 topics related to the Plaintiffs' job duties, Defendants' policies regarding unpaid meal periods, Defendants' policies on timekeeping and payroll, Defendants' alleged efforts towards FLSA compliance, and Defendants' alleged efforts to train the Plaintiffs on the FLSA and overtime.

Additionally, given that there were 3,880 Plaintiffs with a recovery period spanning six years, the parties engaged expert witnesses to compile and analyze millions of lines of pay and hours work data, with the Plaintiffs' expert witness layering over mathematical formulas to determine the damages owed in this case. The Plaintiffs' damages expert witness prepared a report, backed up by computer data and programming, which was reviewed and critiqued by Defendants' expert witness, and both witnesses were deposed.

Following discovery, Plaintiffs' Counsel combed through the voluminous records produced during discovery, along with the deposition testimony, to prepare and present summary judgment briefing, where Plaintiffs were successful on several issues. Additionally, Plaintiffs' Counsel prepared a successful motion for a finding that Plaintiffs were similarly situated, and distilled the voluminous record to demonstrate common policies existed that would allow for a representative trial on the various claims at issue in this case.

Finally, while the similarly situated ruling would permit the trial to proceed using representative testimony, there remained several complex questions left for the jury to decide including: 1) whether the Defendants suffered or permitted Plaintiffs to perform uncompensated pre-shift overtime; 2) whether the Defendants suffered or permitted Plaintiffs to perform uncompensated overtime during their meal periods; 3) how many minutes per week did Plaintiffs spend performing uncompensated pre-shift overtime; 4) how many minutes per week did Plaintiffs spend performing uncompensated overtime during the meal period; 5) whether the Defendants' timekeeping practices resulted in delayed payment of overtime to the Plaintiffs; 6) whether the Defendants willfully violated the FLSA; 7) the damages resulting from the Regular Rate Claim; 8) the damages resulting from the Straight Time Claim; 9) the damages resulting from the Delayed Payment Claim; 10) the damages resulting from the Pre-Shift Claim; 11) the damages resulting from the Meal-Period Claim; and 12) the damages resulting from the Travel Time Claim. These questions would require the Plaintiffs to proffer significant proof at trial to meet their burden on each of those claims.

Taken together, the magnitude of Plaintiffs' claims and the posture of this litigation was complex and required significant effort and expertise by Plaintiffs' Counsel to advance Plaintiffs' claims and reach a favorable outcome.

## 2. The Time and Labor Required Was Extensive

Significant time and labor was spent by Plaintiffs' Counsel in reaching the settlement.[12] McGillivary Decl., ¶¶ 2-4,14-27; Pordy Decl., ¶¶ 13-23. During the three years spent litigating this lawsuit, Plaintiffs' Counsel have not been paid for any of the work that they have performed. This uncompensated work has been substantial and includes: 1) interviewing Plaintiffs and investigating claims; 2) preparing and filing the Complaint; 3) attending court conferences; 4) engaging in initial limited discovery on payroll and timekeeping in response to Defendants' efforts to dismiss the complaint; 5) preparing the Second Amended complaint and damages exhibits; 6) negotiating a discovery plan with Defendants; 7) preparing written discovery to Defendants; 8) analyzing written discovery requests and conferring with over 100 Phase One Plaintiffs to respond to same; 9) working with Phase One Plaintiffs to compile documents in response to Defendants' requests; 10) meeting with 51 Plaintiffs' to prepare for depositions; 11) defending 51 Plaintiff depositions; 12) noticing Rule 30(b)(6) depositions on 57 topics; 13) preparing for Rule 30(b)(6) depositions; 14) taking Rule 30(b)(6) depositions; 15) engaging an expert damages witness to prepare damages calculations by analyzing millions of lines of data; 16) analyzing the report of Defendants' expert witness; 17) taking and defending expert damages' witnesses depositions; 18) drafting the summary judgment briefing; 19) drafting the similarity situated briefing; 20) preparing responses and replies; 21) preparing a settlement demand; 22) conferences with the Settlement Plaintiffs; 23) engaging in extensive settlement discussions; 24) preparing for trial; 25) negotiating over the written terms of the settlement agreement; 26) notifying 3,880 Plaintiffs of the terms of the settlement agreement; 27) responding to questions regarding the settlement; 28) preparing the settlement approval papers; and 29) preparing for administration of the Settlement. McGillivary Decl., ¶ 4; Pordy Decl., ¶¶ 16-20.

## 3. The Fee in Relation to the Settlement Fund is Reasonable

The cases cited in Section c.i confirm the reasonableness of the requested fee, as it is consistent with other FLSA cases in this Circuit. As demonstrated in Section c.ii.7 below, the fee represents a lodestar multiplier that is well within the range approved by courts in this Circuit.[13]

---

[12] Attached to this letter as Exhibit 3 is the Declaration of Gregory K. McGillivary and accompanying fee and expense listings for services performed by McGillivary Steele Elkin LLP. Exhibit 5 is the Declaration of Hope A. Pordy and accompanying fee and expense listing for services performed by Spivak Lipton LLP.

[13] In analyzing percentage of the fund agreements in FLSA/Rule 23 hybrid actions, courts have cited An Empirical Study of Class Action Settlements and Their Fee Award, 7 J. Empirical Legal Stud. 811, 817 for the position that the median percentage of fees in common fund settlements is between 25 and 27 percent, however, *that study specifically excluded from its analysis opt-in FLSA collective actions.* Brian T. Fitzpatrick: An Empirical Study of Class Action Settlements and Their Fee Award, 7 J. Empirical Legal Stud. 811, 817 ("I excluded from this analysis opt-in collective actions, such as those brought pursuant to the provisions of the Fair Labor Standards Act (see 29 U.S.C. § 216(b).") FLSA collective actions, such as this one, are not analyzed with the same scrutiny as a Rule 23 class action because they do not implicate the same due process concerns as class actions which implicate the rights of *absent* class members. This is especially

Page 19 of 21
Hon. Lorna G. Schofield

A case "does not require a 'sliding scale' approach to prevent a windfall" where "the requested amount is 'consistent with the norms of class litigation in this circuit.'" *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 U.S. Dist. LEXIS 105596, 2014 WL 3778173 at *38-39 (S.D.N.Y. July 31, 2014); quoting *Willix*, 2011 U.S. Dist. LEXIS 21102, 2011 WL 754862 at *6-7 (awarding one-third of $7.675 million settlement fund in FLSA and NYLL wage and hour action); *see also Clark,* 2010 U.S. Dist. LEXIS 47036, 2010 WL 1948198 at *8-9 (awarding 33% of $6 million settlement fund in FLSA and multi-state wage and hour case); *Beckman*, 293 F.R.D. at 481 ("Class Counsel is requesting 33% of the $4.9 million settlement. This case does not require a 'sliding scale approach to prevent a windfall because the requested amount is consistent with the norms of class litigation in this circuit.'"). Moreover, a Court's "primary goal when awarding fees is to approximate the prevailing market rate for counsel's services*." In re Comverse Tech., Inc., No.* 2010 U.S. Dist. LEXIS 63342, at *11-15 (E.D.N.Y. June 23, 2010) *quoting Goldberger*, 209 F.3d at 52 ("[M]arket rates, where available, are the ideal proxy for [class counsel's] compensation'); *Arbor Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 184 (awards in fee-shifting cases should approximate market rates)."Because attorneys and clients ordinarily strike their bargain prior to litigation (i.e., when the risk of loss still exists), an ex ante fee agreement is the best indication of the actual market value of counsel's services." *Id*. at *13.

In this case, each of the 3,880 individual Plaintiffs determined that the fair market rate for Plaintiffs' Counsel was 33 1/3% of the funds recovered, and thus awarding attorneys' fees consisting of that amount is warranted.

### 4.  The Risk of Litigation

Plaintiffs' counsel undertook to prosecute this action without any guarantee of payment and litigated on a contingent basis. Plaintiffs' Counsel was required to make a significant investment of time and resources without a guarantee of any kind. The success of such off the clock/unpaid work time cases on a class wide basis involving over 3,880 employees working across all five boroughs would have been hard fought at trial by Defendants and Defendants would have attempted to move for judgment as a matter of law, and to decertify the collective at trial. Accordingly, Plaintiffs' Counsel faced significant obstacles of recovery for the entire class on all claims absent settlement.

### 5.  The Quality of Representation

As described fully in the Declarations of Gregory K. McGillivary, Hope Pordy, and Molly Elkin, and Diana Nobile Plaintiffs' counsel are nationally-recognized experts in the FLSA and wage and hour law, and their expertise benefited the Plaintiffs greatly. For example, Mr.

---

true here where each of the 3,880 Plaintiffs have specifically retained counsel on a 33 1/3% contingency fee basis.

Page 20 of 21
Hon. Lorna G. Schofield

McGillivary has litigated hundreds of FLSA cases and is the author of the government chapter in the treatise "The Fair Labor Standards Act," E. Kearns, and plaintiffs benefited from this level of expertise. McGillivary Decl., ¶ 10. *See also* Pordy Decl., ¶¶ 8-11.

### 6.  Public Policy Weighs in Favor of Approving the Fee

As described above, the risk in this case was high and the work performed by Plaintiffs' Counsel significant. Plaintiffs' case was hardly "run of the mill," in that Plaintiffs presented claims based on common policies and practices justifying collective treatment at trial. Dkt. 205. In doing so, as this Court noted, Plaintiffs achieved the FLSA's policy objectives by avoiding the financial and judicial burden of thousands of individualized trials, and "of reducing costs to Plaintiffs, and conserving judicial resources." Dkt. 205, p. 13. As such, Plaintiffs' Counsel vindicated the rights of those whose wage claims might otherwise be too small to justify the retention of able, legal counsel through the use of a collective proceeding. This advances the broad remedial public policy purposes of the FLSA.

### 7.  A Lodestar Cross-Check Support the Fees Requested

The lodestar multiplier is calculated by dividing the fee award by the lodestar (the reasonable hours billed multiplied by a reasonable hourly rate). *James v. China Grill Mgmt.*, 2019 U.S. Dist. LEXIS 72759, 2019 WL 1915298 at *8 (S.D.N.Y. 2019). "Where the lodestar method is used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Bryant v. Potbelly Sandwich Works, LLC*, 2019 WL 1915298, at *19 (S.D.N.Y. 2020). Here, in light of the individual agreements with Plaintiffs' Counsel signed by each of the 3880 Plaintiffs providing for a 33 1/3% contingent fee, and expressly incorporated into the Settlement Agreement, the Court may find on that basis, alone, that the negotiated Agreement sufficiently establishes the reasonableness of the fee. See discussion supra p. 12-13. Nevertheless, a lodestar cross-check will further demonstrate that the Settlement is fair and reasonable based on approved fee awards within the Second Circuit.

Multiplying the hourly rates here by the hours of work performed results in a lodestar of $2,373,641.10. Thus, Plaintiffs' Counsel one third contingent fee agreement with the Plaintiffs resulted in this case of a multiplier of 3.87. "Courts in this Circuit regularly award lodestar multipliers from two to six times lodestar with some courts approving fee requests that are up to eight times the lodestar, and in some cases, even higher...." *Bryant v. Potbelly Sandwich Works, LLC*, 2020 WL 563804, at *19 (S.D.N.Y. 2020); *Beckman*, 293 F.R.D. at 481; *Ceka v. PBM/CMSI Inc.*, 2014 WL 6812127, at *1 (S.D.N.Y. 2014) (approving 3.36 multiplier); *Pena v. Le Cirque, Inc.*, No. 14 Civ. 7541, Dkt. Nos. 45 & 46 (approving 4.9 multiplier); *James v. China Grill Mgmt.*, 2019 U.S. Dist. LEXIS 72759, 2019 WL 1915298 at *8-9 (approving 3.53 multiplier).

Where a lodestar cross-check is applied, courts consider "whether a multiplier is warranted based on factors such as (1) the contingent nature of the expected compensation for services rendered; (2) the consequent risk of non-payment viewed as of the time of filing the suit; (3) the quality of representation; and (4) the results achieved." *Henry*, 2014 U.S. Dist. LEXIS 72574, 2014

Page 21 of 21
Hon. Lorna G. Schofield

WL 2199427 at *43-44; *In re Boesky Secs. Litig.*, 888 F. Supp. 551, 562 (S.D.N.Y. 1995); *see also Goldberger*, 209 F.3d at 4.

  As set forth in Section c.ii.1, Plaintiffs' counsel zealously and skillfully litigated this collective action with no guarantee of success and in response to the Defendants' vigorous defense. Moreover, the Plaintiffs — a group of 3,880 essential security personnel working in New York City schools -- achieved an outstanding degree of success in recouping unpaid overtime wages. Under these circumstances, a 3.87 multiplier is appropriate.

### d. Approval of Plaintiffs' Counsels' Expenses is Warranted

  In this litigation, Plaintiffs' counsel has incurred $154,029.05 in out of pocket expenses. A detailed breakdown of the expenses incurred by McGillivary Steele Elkin LLP is attached to the Declaration of Gregory McGillivary as Exhibit A. A detailed breakdown of the expenses incurred by Spivak Lipton LLP is attached to the Declaration of Hope Pordy as Exhibit A. Counsel are entitled to reimbursement of litigation expenses from the settlement fund. 29 U.S.C § 216(b). Plaintiffs' counsels' expenses, including experts, copying, electronic research, travel and printing, were reasonable and necessary to counsel's representation of Plaintiffs. *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 390 (S.D.N.Y. 2017) (awarding expenses for experts, copying, electronic research, travel and printing, and other out-of-pocket expenses).

### IV. Conclusion

  For all of the above reasons, the parties believe that this Settlement is a favorable outcome and will appropriately compensate Plaintiffs for the overtime pay issues that are the subject matter of this litigation. Accordingly, the parties respectfully submit that the Settlement, in its entirety, is fair and reasonable and should be approved by the Court.

      Sincerely,

      MCGILLIVARY STEELE ELKIN LLP

      /s/ Gregory K. McGillivary
      Gregory K. McGillivary

cc: All Counsel of Record (vis ECF)